THE STATE OF KANSAS, *Plaintiff*, v. M. C. KENNEDY, *Defendant.*

No. 16,305.

SYLLABUS BY THE COURT.

1. COUNTY COMMISSIONERS—*Repair of County Bridges.* Under the provisions of article 2 of chapter 14 of the General Statutes of 1909 the board of county commissioners must determine what bridges shall be repaired at the expense of the county, the plans to be followed, the material to be used and the cost of the work, and must make appropriations to pay for the work. It may appoint a superintendent of repair for each bridge, but is not obliged to do so, and may itself exercise general oversight and supervision of the execution of contracts for such work.

2. ——— *Performance of Official Services by a Single Member Outside of Board Meetings.* The efficient discharge of its duties may, and frequently does, require the board of county commissioners to perform official services outside of board meetings. In some instances the joint observation and combined participation of all the members may not be necessary, and in such a case a single member, acting as a committee of the board, may render lawful services as a commissioner. Bridge repair work and oversight of the poor farm may afford opportunity for such services.

3. ——— *Compensation of Members of Board.* The statutes of this state do not limit the compensation of members of the board of county commissioners to pay for services rendered at board meetings, and single members performing services of the kind described in paragraph 2 may be paid therefor the per diem compensation provided by statute, and statutory mileage.

4. ——— *"Corruption"—Removal from Office—Payment of Illegal or Excessive Demands against County.* "Corruption," within the meaning of section 2309 of the General Statutes of 1909 (Gen. Stat. 1868, ch. 25, § 180), providing that if any county commissioner shall corruptly perform any duty he shall forfeit his office and be removed, involves the intentional disregard of law from improper motives; and in order that the payment of excessive or illegal demands against the county may be corrupt the commissioner must have purposed to violate his official duty, defraud the county by misappropriating its funds and secure to himself or to some one else unlawful gain.

5. ——— *Burden of Proving Corruption—Presumption of Honesty and Good Faith.* In an action to remove a county commissioner on the ground that he corruptly performed his duties the burden of showing corruption rests upon the state. The law presumes honesty and good faith until the contrary is made to appear by evidence, and the commissioner is not called upon to justify himself until something evidencing corruption is offered.

6. ——— *Same.* In such an action record proof of the number of board meetings attended by the commissioner in a given month merely shows what his compensation for attending board meetings in that month should be. It does not tend to prove that other services were not performed, or cast the burden upon the commissioner of justifying the receipt of more compensation for that month than he was entitled to for attending board meetings.

7. ——— *Payment of Unverified Claims—Inadvertence—Corruption.* Occasional departures by the board of county commissioners from the statute relating to the allowance of claims against the county, as that claims were not verified, occurring through mere inadvertence, without wrongful intent and under circumstances exposing the county to no imposition or injury, do not constitute corruption.

8. ——— *Payment of Claims Not Sufficiently Itemized—Advice of County Attorney.* The payment of claims which are not sufficiently itemized, occurring through a misinterpretation of the statute relating to that subject, does not constitute corruption, where the board acts in good faith and relies upon the advice of the county attorney that the claims are sufficiently itemized.

9. ——— *Neglect or Refusal to Perform Official Duty—Removal from Office.* Under section 2309 of the General Statutes of 1909 (Gen. Stat. 1868, ch. 25, § 180), providing that if any commissioner or other county officer shall neglect or refuse to perform any act which it is his duty to perform he shall forfeit his office and be removed, the duty must be personal and the act must be one which the officer has the legal capacity and authority to perform or he can not be guilty of neglect.

10. ——— *Forfeiture of Office—Grounds.* It is not every oversight or omission within the strict letter of the law which will entail forfeiture of office. The purpose of the statute is to prevent persons from continuing to hold office whose inattention to duty, either because of its habitualness or its gravity, endangers the public welfare; and the neglect contemplated must disclose either willfulness or indifference to

duty so persistent or in affairs of such importance that the safety of the public interests is threatened.

11. ———— *Same.* Under the circumstances of this case it is held that irregularities in the publication of statements of sums of money allowed and in advertisements for bids for bridge repair work, failure to publish estimates of expenditures upon which tax levies were made, and failure to advertise for bids for the repair of a bridge, do not constitute legal causes for the removal of a county commissioner from office on the ground of neglect of duty.

Original proceeding in quo warranto. Opinion filed May 7, 1910. Judgment for the defendant.

*Fred S. Jackson,* attorney-general, *Lee Bond,* county attorney, and *Keplinger & Trickett,* for the plaintiff.

*William Dill,* and *A. E. Dempsey,* for the defendant.

The opinion of the court was delivered by

BURCH, J.: This proceeding was instituted to remove the defendant from the office of county commissioner of Leavenworth county, on the ground that he corruptly performed his duties. The petition was amended to include a charge of neglect and refusal to perform acts which it was his official duty to perform. A commissioner was appointed who, after hearing the evidence and the arguments of counsel, has returned findings of fact and conclusions of law exonerating the defendant. The plaintiff attacks the commissioner's report on numerous grounds.

The findings of fact cover every issue raised by the pleadings, and it was unnecessary to extend them further. Some of those which are most important are based upon the testimony of witnesses whom the commissioner chose to believe in preference to others. From an examination of the abstracts it appears that a choice was unavoidable, that it was not arbitrarily made, and that in some instances it necessarily rested in part upon considerations which a printed record can not present. A number of matters were covered by testimony bringing them within the proved custom and

practice regularly governing the transaction of county business. The commissioner appears to have relied upon this testimony in opposition to some evidence to the contrary, the weight and credibility of which he was obliged to determine. Some of the testimony for the state was of such a character that, in the light of all the evidence, the commissioner did not credit it. This observation applies to some matters which the defendant did not notice in his testimony. The commissioner's method in dealing with the evidence has been tested in other respects, and was plainly such as any trial judge would have been obliged to pursue. One of the chief controversies related to the value of bridge work. By consent of the parties, and accompanied by representatives of the parties, the commissioner visited and inspected all of the larger bridges in question and thirty of the smaller ones. Statements and explanations were made by representatives of the parties at the time of these inspections, and the bridges were examined in the light of such statements and explanations and in connection with the evidence already taken. The course adopted was wise, was consented to, no objections were interposed at the time to anything that occurred, and criticism upon the commissioner's conduct in this respect comes now with poor grace and no force. The court has taken pains to search the record for proof of the burden of the petition—willful corruption, dishonesty, conspiracy to rob and defraud the county, and like charges. There is none. Without discussing the evidence, which is voluminous and conflicting, it is sufficient to say that it sustains the findings of fact. The only questions to be considered are whether the commissioner misapprehended the law at any material point and whether his conclusions of law are correct.

The action is prosecuted under section 180 of chapter 25 of the General Statutes of 1868 (Gen. Stat. 1909, § 2309), which reads as follows:

"If any board of county commissioners, or any commissioner, or any other county officer, shall neglect or

The State v. Kennedy.

refuse to perform any act which it is his duty to perform, or shall corruptly or oppressively perform any such duty, he shall forfeit his office, and shall be removed therefrom by civil action in the manner provided in the code of civil procedure."

The defendant is charged with corruption in the matter of his salary and mileage for the years 1907 and 1908. The statute reads as follows:

"Each member of the board of county commissioners of the several counties of the state shall receive as full compensation for his services for the county the sum of three dollars per day, and shall each be allowed and receive five cents per mile for each mile actually and necessarily traveled in the transaction of any of the duties of said office, to be paid out of the county treasury in quarterly installments; provided, that the salary of each commissioner shall not exceed in any one year the following amounts:   .   .   .   In counties having a population of   .   .   .   more than 35,000 and not more than 45,000, per annum, $700.   .   .   .   Provided, that the salary herein provided shall be in full for all services of every kind performed by such commissioners." (Laws 1899, ch. 141, § 1; Gen. Stat. 1909, § 3676.)

The population of Leavenworth county was about 40,000. Consequently the board was governed in the matter of building and repairing bridges by article 2 of chapter 14 of the General Statutes of 1909. Under this statute it is the duty of the board to determine what bridges shall be built and what repaired at the expense of the county, and to make appropriations therefor. When the board deems it necessary to build a bridge it must determine upon the plan and the material to be used and estimate the cost. The board may appoint the township trustee or the road overseer of the district or some other person to superintend the work of construction. This provision of the statute, however, is permissive. The board is not compelled to appoint a superintendent of construction, and is at liberty to adopt any other method of supervision which shall be to the interest of the county, under the circumstances. When a bridge is completed according to contract the statute

provides that it must be accepted and paid for. Substantially the same procedure governs and the same functions must be performed in repairing as in constructing bridges. If a superintendent of construction or repair be appointed, he is paid $1.50 per day for the time necessarily consumed.

There are about 700 bridges and culverts in Leavenworth county maintained by the county. Owing to ordinary depreciation and successive floods in 1903 and the following years a very large amount of repair work was necessary during the time covered by the petition. The board adopted a rule making each commissioner from outside the city of Leavenworth chairman of the committee on roads and bridges for his district. As such he gave special attention to the duties of the board relating to bridge matters in his district. In case of a demand for repairs he would ascertain the need, and if necessary would visit the bridge for that purpose. If repairs were required he would notify the county surveyor, who by general order would make an estimate of the cost of the work. The action taken would be reported to the board. If the cost were less than $100, informal direction for the work to be done would be given and a contract would be let. Usually contracts for repairs were performed under supervision of the county surveyor, but the committee chairman frequently visited bridges in his district undergoing repairs for the purpose of scrutinizing the work or finally approving it. When the bills came in they were approved by the county surveyor and audited by the county auditing board, consisting of the board of county commissioners, the county clerk and the county attorney. In making its recommendations this board relied largely upon the information possessed by the committee chairman in whose district the work was done, and upon the county surveyor. After bills were audited they were presented to the board of county commissioners proper for allowance and payment. The defendant received the statutory compensation for serv-

ices outside of board meetings of the character described, and mileage.

The advantages of the method outlined for dispatching county bridge repair work are obvious. It was simple, reliable and businesslike. No attempt was made at the hearing to show that it increased the cost to the county. True, it might be abused by a dishonest board into a scheme to furnish illegitimate employment to its members, but there is no proof of such misconduct in this case. The services rendered by the defendant were not performed by him as a private individual for the board, or as an employee of the board. The board itself acted for the county, by and through him. He acted solely in the capacity of a county commissioner representing the county in the conduct and management of its business affairs. He was not usurping any of the functions of road overseer or township trustee, or performing any of the duties of a hired superintendent of repair. The efficient discharge of its duties requires the board of county commissioners to perform numerous official services outside of board sessions. The statute quoted does not restrict compensation to salary for services rendered at board meetings only, and there is no statute of that character in this state, as there is in some states. Therefore the defendant was entitled to $3 per day for whatever time he necessarily consumed, and five cents per mile for each mile actually and necessarily traveled, in looking after county bridge repairs. There is no doubt that the board of county commissioners is an entirety, and must act as such. Its authority can not be delegated to a single member, and an individual member can not bind the county. But these principles are beside the question. As a practical matter a certain division of labor is indispensable to the transaction of the public business at board meetings, and if done in absolute good faith the same division may be extended to certain classes of work which must be performed outside of

board meetings. In this case the defendant had general oversight of the poor farm. Another member had general supervision of the courthouse, the courthouse grounds and the jail. On a given day these two members may be separately occupied with these duties while the third visits a reported bridge to ascertain what, if any, repairs are needed. Action by the board is required in each instance, but the joint observation and combined participation of all the members would be superfluous. If in such a case the board be guided by the sole motive of rendering faithful and efficient public service within the scope of its lawful powers, each member is entitled to compensation according to the statute.

During the time covered by the petition the board expended for bridge work and material nearly $36,000. The commissioner found that the board paid a total of $196.80 more than the work was worth for the repair of seven small bridges, the excess for each bridge being from $10 to $49. The defendant voted to pay these bills. The state does not point out how many, if any, of the several bridges were in the defendant's district. It may be assumed that some of them were. The defendant also joined with his associates in paying a bill for the printing of primary election ballots which had been approved by the county clerk and by the auditing board. Afterward a question arose concerning the proper method of computing the printer's compensation. The county attorney was consulted, and the opinion of the attorney-general was taken. The board then demanded that the printer refund a portion of the amount he had received, to conform to the attorney-general's interpretation of the law, which the printer did. The original bill was $1246, and the amount refunded was $770. The commissioners were not familiar with the decision of this court in the case of *Honey v. Jewell County*, 65 Kan. 428, and made the same mistake the commissioners of Jewell county made, which occasioned that suit.

There is no evidence whatever that the appropriations enumerated were corruptly made. Corruption, in the sense of the statute quoted, involves the intentional disregard of law from improper motives. The defendant must have purposed to violate his official duty, defraud the county by misappropriating its funds, and secure to himself or to some one else unlawful gain. The principle is well illustrated in two decisions from Idaho, rendered under a statute providing for the removal of an officer for charging and collecting illegal fees. In that state county commissioners are entitled to compensation for services rendered at board meetings only. Members of certain boards parceled out among themselves road and bridge work which none but road overseers could legally perform, for which they charged and collected compensation and mileage. In the case of *Miller v. Smith,* 7 Idaho, 204, collusion, fraud and corruption were proved, and the guilty commissioner was removed and fined. In the subsequent case of *Ponting v. Isaman,* 7 Idaho, 581, it was found that the commissioner there prosecuted had acted honestly and in good faith. The syllabus by the court reads:

"When proceedings under section 7459 of the Revised Statutes are brought to remove a county officer, and the court finds that such officer acted honestly in making such charges against his county, and honestly believed at the time he presented his claim for allowance, and when he collected the same, that such charges were legal, it is error to remove him from office and enter judgment against him for the penalty provided by said section."

Even if, therefore, the charges made by the defendant for services and for mileage in connection with bridge repairs had been illegal, his innocence, good faith and integrity would protect him from removal on the ground of corruption. The same rule applies to other appropriations of money.

The defendant presented itemized and verified

claims for salary and mileage, showing the days on which he rendered services and the number of miles traveled each month. The state introduced the records showing the number of board meetings the defendant attended in each month, and proved the distance he lives from the courthouse. Computing salary and mileage from these data, the amounts were less than the defendant received. It is argued that he should have explained the remainder. The state brought the action, and the burden rested upon it to prove corruption on the part of the defendant sufficient to warrant his removal from office. The law presumes he regulated his conduct according to his oath until the contrary is made to appear by proof. (*The State v. Trinkle,* 70 Kan. 396.) He was not called upon to justify himself until something evidencing corruption was offered. If he did not consume the time or travel the miles for which he charged, the state should have shown the facts. The proof offered had no tendency of that kind. Aside from mere presumption, however, the defendant's official probity was fully established.

In a number of instances bridge bills were paid which had not been verified according to law. The vouchers were approved by the county surveyor and by the auditing board, and blank forms for verification which the board provided were attached but not filled out. The omission of proper verifications upon the bills was simply overlooked. Such occasional departures from the statute relating to the allowance of claims, occurring as they did through mere inadvertence and without wrongful intent, and under circumstances exposing the county to no imposition or injury, do not, of course, constitute corruption as it has been defined. The same subject is brought forward in the petition under an allegation of neglect and failure to require the verification of accounts. The commissioners have no mandatory power to compel parties

to verify claims. They merely have authority to reject unverified claims. The subject of neglect of official duty will be considered later in this opinion.

Numerous bridge bills approved by the county surveyor and by the auditing board were paid which it is charged were not itemized according to law. The work was done under contracts based on estimates made by the county surveyor, was done under the supervision of the surveyor and members of the board, was inspected by the county surveyor when completed, and the county surveyor approved the vouchers before they were presented. The vouchers indicated the bridge on which the work was done, and the amounts of the bills. The members of the board considered with the county attorney the question whether such bills were sufficiently itemized, and accepted his advice that they were. If any mistake were made, which is not decided, it consisted in the misinterpretation of a statute as applied to a particular state of facts. There is no doubt of the ability and the sincerity of the county attorney or of the good faith of the board. In such cases advice by the county attorney and honesty of purpose on the part of the board protect members of the board from forfeiture of office on the ground of corruption.

"Where a board of county commissioners, upon the advice of able and competent attorneys at law, allows certain claims which are not strictly legal charges against the county, its official action in so doing will not render the commissioners liable to the charge of corruption, or forfeiture of office, if the allowances were honestly made and the board acted merely upon a mistake or error of law as to the liability of the county." (*The State, ex rel., v. Scates,* 43 Kan. 330, syllabus.)

"When it is shown that such officer [a county commissioner] acted in perfect good faith, and under an honest conviction that he was entitled to the compensation claimed and collected, and was acting under the legal advice of the county attorney, it is error to re-

move him from office." (*Ponting v. Isaman,* 7 Idaho, 581, syllabus.)

Charges of corruption in drawing salary monthly and in making corrections of the tax rolls are covered by the principles already stated and applied.

The petition alleges, in effect, that the defendant conspired with others to rob and defraud the county, and that, to accomplish the corrupt designs of the conspirators, he neglected and refused to publish monthly statements of expenditures and to publish estimates of expenditures upon which tax levies were based. After much evidence had been taken the petition was amended to include the charge of simple neglect and refusal to perform official duty in these and in some other matters. The statute reads as follows:

"The board of county commissioners shall cause to be published a statement, at the close of every regular or special meeting, of all sums of money allowed, and for what purpose; said statement to be published once in some paper of general circulation in the county. They shall also publish a statement of the estimate of expenditures for the various purposes upon which they based their levy of a tax for the various purposes of revenue." (Gen. Stat. 1868, ch. 25, § 35; Gen. Stat. 1909, § 2099.)

Another statute prohibits the allowance of any claims or accounts at a special or adjourned meeting, except election expenses and jury fees.

Formerly the law provided that the Leavenworth county board should meet quarterly. At the close of each session a proper statement was duly published. Later the law was changed and monthly sessions were required. The full consequence of this change was not noted, and the board continued to publish statements quarterly as before, but not monthly. This practice was in vogue when the defendant came into office, and continued through the years of 1907 and 1908. It will be observed that statements for all monthly allowances

were in fact published, and that a statement of allowances made at the last meeting in each quarter was published at the proper time. Therefore all that is left of this charge is that, because of failure to take note of an amendment of the statutes, publication of tne allowances at two meetings in each quarter was delayed.

The failure to publish estimates of expenditures upon which tax levies were based is of more consequence. Such estimates were always spread in full upon the records of the meetings at which they were made, and were afterward printed on the backs of tax receipts, and so were made public in a way, but the statute prescribes publication in a newspaper. At the time of the hearing the county clerk had held his office for some thirty years. The defendant believed it was the clerk's duty to compile financial statements and publish them, and that the clerk knew his duties under orders in force prior to the time the defendant became commissioner. The defendant was under the impression that the estimates for 1908 had been published, and never knowingly omitted to perform any duty required of him.

The neglect feature of the removal statute upon which the prosecution is based is involved only so far as it deals with individual responsibility. The penalty denounced can not be inflicted on an individual officer because of neglect of duty unless he has neglected to perform some "act which it is his duty to perform." (Gen. Stat. 1868, ch. 25, § 180; Gen. Stat. 1909, § 2309.) Manifestly the duty must be personal and the act must be one which he is able to perform or he can not be at fault. He can not be guilty of neglect in failing to perform an act which he has no legal capacity or authority to perform. The duty to publish estimates of expenditures, like the duty to publish monthly statements, rested upon the board as a board.

25—82 KAN.

It was impossible for the defendant alone to make a valid order for publication or to authorize a valid publication in the official or in any other newspaper. Those acts were beyond his lawful power, and his neglect must consist, if at all, in participating in an omission of the board. It is not every oversight or omission within the strict letter of the law which will entail forfeiture of office. The statute must be interpreted in the light of the mischief it was intended to remedy. (*The State v. Bush,* 47 Kan. 201.) The purpose was to prevent persons from continuing to hold office whose inattention to duty, either because of its habitualness or its gravity, endangers the public welfare. Therefore the neglect contemplated must disclose either willfulness or indifference to duty so persistent or in affairs of such importance that the safety of the public interests is threatened. Under all the circumstances stated it is held that a case of neglect within the purview of the statute has not been established.

The condition of the bridges in Leavenworth county has been referred to. Because of the interruption of travel and interference with mail routes the people were clamoring for bridge repairs and road work. Under the bridge law, if repairs cost more than $100 the procedure for building bridges must be followed, and this requires an advertisement for bids for twenty days. Under the stress of the circumstances stated the board often shortened the time of advertisement, and in a few instances did so because of other emergencies. It acted deliberately and with full knowledge of the law. The motive was to protect the property and promote the best interests of the people of the county. In one instance a bridge lay in the creek and was in immediate danger of being lost and destroyed. On the other hand, in one instance the board was misled and consequently was mistaken as to the necessity for prompt action. There was credible evidence that all short-time advertisements produced competitive bids.

The commissioner finds that all contracts under such advertisements were for the fair and reasonable value of the work.   There was no advertisement at all and there were no competitive bids for the rebuilding of one bridge.   The bridge was an important one on the line between Leavenworth and Wyandotte counties, and was in a dangerous condition.   Under the law the duty to advertise for bids rested with Wyandotte county.   It declined to proceed in the regular way, but agreed to pay its share of the joint expense if Leavenworth county repaired the bridge.   The defendant protested against making a contract without advertisement, but finally deferred to the judgment of his associates because the welfare of the county required that the bridge be rebuilt at once.   One of the members maintained that they always had the right to proceed without advertisement when life and property were at stake.   It is undisputed that the work was well done and the amount paid was reasonable and just. There was no corruption in any of these cases.

The law relating to advertisement for bids is general in its terms.   It makes no provision for exceptions and emergencies.   This may be from oversight, but more likely it is because in the judgment of the legislature it would be dangerous to the public to allow all county boards to act upon whatever they might deem to be emergencies.   The court does not propose to abate the force of the statute, but it requires a very savage insistence on the letter of the law to demand the defendant's removal from office for what he did. It is expected that boards of county commissioners will be diligent in taking affirmative action to protect and to promote the general welfare.   Checks upon their conduct are collateral means to the same ultimate end, but in a particular instance they may operate as embarrassments.   Here advertisements were made in all cases except that of the county-line bridge, where the defendant protested and the duty devolved upon

another board. The purpose of the statute—competitive bids and fair contracts—was in fact attained through the advertisements made. While the course pursued departed slightly from that prescribed, it is free from culpability of the character the statute denounces. Besides this, the law of quo warranto authorizes the court to take a broad view of motives and circumstances in the case of an official who has assumed the responsibility of rendering the public a genuine service in a somewhat irregular way, and, although not sanctioning the defendant's conduct as legal, the court is not obliged to deprive him of his office on account of it. (*The State v. Bowden*, 80 Kan. 49.)

The foregoing contains a review of the principal charges made against the defendant. Others are embraced within the same considerations. The findings of fact and conclusions of law returned by the commissioner are approved. Restraining orders heretofore made in the case are set aside, and judgment is rendered in favor of the defendant, with costs.