No. 22,707.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, *Plaintiff*, v. HENRY H. DEICHLER, *Defendant*.

SYLLABUS BY THE COURT.

QUO WARRANTO—*Ouster of Mayor of City—Neglect of Official Duty.* In a proceeding in quo warranto to oust the mayor of a city for failure to enforce the prohibitory liquor law, the evidence is held sufficient to warrant a judgment of ouster.

Original proceeding in quo warranto. Opinion filed December 30, 1920. Judgment of ouster.

*Richard J. Hopkins,* attorney-general, *C. A. Matson* and *J. K. Rankin,* assistant attorneys-general, for the plaintiff.

*J. B. Tomlinson,* of Independence, and *Charles D. Welch,* of Coffeyville, for the defendant.

The opinion of the court was delivered by

PORTER, J.: The attorney-general brought this original proceeding in quo warranto to oust the defendant from the office of mayor of Coffeyville, a city of the first class. The petition charged defendant with neglect and failure to enforce the laws and ordinances prohibiting the sale of intoxicating liquor, maintaining public nuisances where intoxicating liquors were unlawfully kept for sale and for his failure to make reports to the county attorney concerning violations of the prohibitory law and other laws of the state, and ordinances of the city concerning which he had knowledge. The defendant has held the office since April 1, 1919.

The proceeding was commenced on November 19, 1919; on January 27, 1920, an amended petition was filed; on March 4 the court appointed the Honorable James A. McDermott, of Winfield, commissioner, to take the testimony and to make findings of fact and conclusions of law, and he began taking testimony on March 23, and finished on the 26th day of March. September 3, the case was argued before the commissioner, and on September 30 his report was filed. The abstract and brief of plaintiff was filed on November 12, and the case submitted on December 7. The defendant's term of office will expire on December 31.

The commissioner, after setting forth his findings of fact, held that the defendant has willfully and negligently failed and refused to enforce the laws of the state and the ordinances of the city relating to the sale and use of intoxicating liquors and other laws and ordinances and that he should be ousted from his office. The principal contention of the defendant is that there is no evidence in the record to justify the conclusion that the defendant willfully refused to enforce the prohibitory law. We are unable to agree with this contention. It is true that where the commissioner's findings of fact are objected to they are only advisory and this court must examine and weigh the

testimony to determine what the judgment should be. (*The State, ex rel., v. Foley,* 107 Kan. 608, 193 Pac. 361.) No useful purpose would be served by setting forth in this opinion all the findings of fact made by the commissioner. Those respecting the failure of the defendant to enforce the laws relating to the maintaining of nuisances under the prohibitory law and his neglect to report to the county attorney information he acquired concerning the violation of the same law are all that it is deemed necessary to comment upon. The testimony of but two or three of the seventeen witnesses for the state is sufficient, in our opinion, to support the findings of the commissioner.

The findings show, and the defendant concedes that for several years, including all the time charged in the petition, there was maintained at 110 East Eighth street a liquor nuisance, known as the Hicks place, kept by Bob Hicks, and sometimes conducted by his brother. Charles Smith testified in substance to these facts: He had seen persons drinking liquor in the Hicks place; there was no screen or obstruction to prevent policemen from going from the front room (which appears to have been a restaurant) into the back room; he never knew the doors to be barred; when he bought drinks in the back room the liquor was taken out of the ice box where it was kept in gunny sacks; it was customary when they ran out of intoxicating liquors there to get the witness, who would drive over to the Jim Cox house and get a couple of sacks and deliver them to the Hicks restaurant; when they got there he would take them out of the car and put them in the room; he knew the sacks had bottles in them and learned afterwards that it was bottled whisky, half pints and pints; during the months of May, June and July, 1919, he hauled liquor from the Jim Cox house to the Hicks restaurant probably thirty times and he was not the only one that hauled liquor there; he was paid two dollars for each load comprising two sacks; the Hicks place was four blocks east and three south from the city building; when the state authorities made a raid in Coffeyville and against this place on November 1, 1919, Bob Hicks' brother came to the witness and got him to go down and take some liquor from the Hicks place into the country where Hicks lived and he obtained seven cases of liquor and hauled it to the farm and put it in the orchard.

George Stoneking, who kept the restaurant at the Hicks place, testified to a conversation with the defendant just before the mayor appointed Wananwetsch chief of police in which he told the defendant that Wananwetsch had not been straight, had been ousted from the same office before, and that the mayor ought not to appoint him. He testified that he felt friendly to the mayor and would do anything he could for him; he told him that liquor was being sold at the Hicks place and asked him to send a policeman there, that his own employees were drinking and he wanted it stopped; the mayor said he had no right to go into his place of business and do anything, and witness told the mayor he was giving him the right, but the mayor replied that Stoneking would have to swear out a warrant and he would send the chief of police around.

The defendant in his testimony admitted that the Hicks place had for several years been notorious as a gambling resort and a place where persons resorted for the drinking of liquor, and where liquor was sold. He admitted that when he was about to appoint a chief of police he had a conversation with Wananwetsch with reference to the enforcement of all laws, and especially the prohibitory law, and told him that his chief of police would have to be a man who would enforce the law, and that he knew the trouble that Wananwetsch had gotten into, but would take his application and consider it; that Wananwetsch said he wanted to show the people that he could come back and make good, that he was ousted in 1915 and if he were appointed he would enforce the laws; and that a similar conversation occurred in the city attorney's office at the time Wananwetsch was appointed. It seems to be conceded, and the court is well aware of the fact, that to avoid a judgment of ouster as chief of police in 1915, in an action pending in this court, Wananwetsch resigned, paid a fine, and the proceeding against him was dismissed.

The defendant testified that Hicks opened his place in July, 1919, and was raided July 31, August 4, August 30 and October 30, and that the chief of police told him of several other times it was raided; that he discussed it with the chief of police and told him he wanted the dump cleaned out; that he employed one Fields, a constable who lived outside of the city, as a special officer to watch the Hicks place, as well as others,

when he was in town; that because Fields was a stranger defendant thought he might be able to secure evidence. He informed Fields that he had instructed the chief of police to clean up the Hicks place and the department reported raids to him; and he instructed Fields to report to him anything about the action of the police, and told him to keep an eye on the police force, because they "did not seem to be able to catch anything at the Hicks place"; that Fields told him he would. The defendant further testified that he was aroused to further action by the publication of an editorial, about October 25, in a local paper referring to the locality of the Hicks place as "Whisky Alley," and the police raided the place on the night of October 28 and again on the 30th; that the witness only had a record of the 28th, but was "pretty sure" it was raided on October 30, also; that he talked with the chief of police about the editorial and said, "Getting to be quite a howdy-do that newspapers were calling this Whisky Alley," and told him he wanted that dump cleaned up; that the chief reported to him that he had made a raid and found nothing. The defendant further said he believed in the honesty of his chief of police, relied upon him, and believed that the chief was acting in good faith when he reported that he had made raids.

On cross-examination he testified that there had been ten convictions obtained in the police court but that he had not sent notices of these to the county attorney, but had been informed by the chief of police that they had been sent, and he relied upon the fact that the chief had copies in his possession; that he made no investigation of the record relating to the case against Wananwetsch under a previous administration, but knew that Wananwetsch had resigned before being ousted; that he neither made nor signed any written reports to the county attorney; that the only notices that he had any knowledge of which were sent to the county attorney's office were written notices sent by Wananwetsch concerning the enforcement of the "bone-dry law," but that all the information he had about this he got from Wananwetsch. He testified that he knew they were selling liquor in the city; that he was informed by the police department that when they raided the Hicks place they did not find anything; that he told Fields to keep his eye on the police department but still had absolute

faith in his chief of police and the officers; that after this proceeding was filed and on November 21 he allowed Wananwetsch to resign; that he paid Fields nothing and relied upon his being willing to serve for nothing because he was a deputy sheriff.

The mayor's admissions that he learned, in the different raids at the Hicks place by the police, that no intoxicating liquors were secured and no evidence was obtained; that the police did not find anything, and that he still had faith in his police force, together with his admissions that the Hicks place and others mentioned in the findings and evidence were notorious places, are not consistent with the claim that he was exercising reasonable diligence in attempting to enforce the law. It is common knowledge that so-called raids are often made which are only perfunctory and not intended to produce results. The defendant must have known that he was taking serious chances in appointing as the chief of his police department a man who had been unfaithful in the performance of the same duties under a previous administration, and this information should have put him on his guard and caused him to suspect the good faith of the police department in the reported raids which never produced results.

Without going further into the evidence or findings it is sufficient to say that in the court's opinion the evidence shows that the defendant failed to exercise reasonable diligence to enforce the prohibitory law in two respects. There was a failure to use reasonable efforts to promptly close up nuisances of which he had knowledge, and also the failure to comply with the express provisions of the statute requiring every mayor, sheriff, police judge, police officer, constable and deputy sheriff having notice or knowledge of any violations of the prohibitory law, to notify the county attorney of the fact and to furnish him the names of any witnesses within his knowledge by whom such violation can be shown. (Gen. Stat. 1915, § 5505.) Neglect of the last-mentioned duty was one of the grounds for ousting a former mayor of Coffeyville. (*The State v. Wilcox*, 78 Kan. 597, 97 Pac. 372.)

It is therefore ordered that the defendant be ousted from the office of mayor, the order to take effect immediately, reserving to him his right to apply for a rehearing upon any question of fact or law he may desire to raise. The writ will issue.